UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

EBONY DUNAWAY, on behalf of E.B.,

                Plaintiff,

       v.

CAROLYN COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

<u>DECISION & ORDER</u>

14-CV-6301P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Ebony Dunaway ("Dunaway") brings this action on behalf of her minor daughter E.B. pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income Benefits ("SSI"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 12).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 8, 10). For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

## BACKGROUND

### I.   Procedural Background

On June 19, 2008, Dunaway protectively filed an application for SSI benefits on

behalf of E.B. alleging disability due to her learning disability.  (Tr. 134, 138).[1]  On August 20,

2008, the Social Security Administration denied the application for benefits, finding that E.B.

was not disabled.  (Tr. 60).  Dunaway requested and was granted a hearing before Administrative

Law Judge John P. Costello (the "ALJ").  (Tr. 30, 65-72, 77-91).  The ALJ conducted a hearing

on December 15, 2009, at which the claimant was represented by her attorney, Gregory Fassler,

Esq.  (Tr. 30-59, 92).  In a decision dated January 12, 2010, the ALJ found that E.B. was not

disabled and was not entitled to benefits.  (Tr. 14-25).  On August 12, 2010, the Appeals Council

denied Dunaway's request for review of the ALJ's decision.  (Tr. 1-4).

Dunaway commenced an action seeking review of the Commissioner's decision.

(Tr. 402-08).  On October 4, 2011, United States District Judge David G. Larimer issued a

Decision and Order vacating the Commissioner's decision and remanding the matter for further

proceedings.  (*Id.*).  According to Judge Larimer, the ALJ had erred in his assessment of two of

the domains of functioning:  "acquiring and using information" and "interacting and relating

with others."  (Tr. 405-06).  With respect to the domain of "interacting and relating with others,"

Judge Larimer concluded that the ALJ failed to consider "the impact of [E.B.'s] severe delays in

receptive and expressive language on her ability to engage in human interaction and specifically

failed to properly apply [E.B.'s] scores on a standardized Clinical Evaluation of Language

Fundamentals, fourth edition ("CELF-4") test."  (Tr. 406-07).  According to Judge Larimer,

E.B.'s CELF-4 scores demonstrated a "severe delay in receptive and expressive language skills

a[s] evidenced by scores 2 standard deviations below the mean," which "would generally direct a

---

[1]  The administrative transcript shall be referred to as "Tr. __."

finding of 'marked' disability with respect to the domain of 'interacting and relating with others.'" (Tr. 407). Judge Larimer concluded that the brevity of the ALJ's analysis of this domain made it "impossible for [the] [c]ourt to assess whether proper legal standards were applied, and to find that the ALJ's conclusions are supported by substantial evidence." (Tr. 407-08). Further, he concluded that the record did not contain "persuasive proof of disability" and thus remanded the matter for further proceedings consistent with his decision. (Tr. 408).

The ALJ conducted a further hearing on December 3, 2012, at which the claimant was represented by her attorney, Ida Comerford, Esq. (Tr. 338-73, 448). In a decision dated December 28, 2012, the ALJ found that E.B. was not disabled and was not entitled to benefits. (Tr. 317-31). On February 26, 2013, Dunaway filed exceptions to the ALJ's decision. (Tr. 310-13). On April 11, 2014, the Appeals Council determined that Dunaway failed to timely file exceptions to the ALJ's decision and indicated that the ALJ's decision was the final decision of the Commissioner. (Tr. 297-99). Dunaway commenced this action on June 3, 2014, seeking a review of the Commissioner's final decision. (Docket # 1).


II.   **Non-Medical Evidence**

    A.   **Application for Benefits**

E.B. was born in 2000 and is now fifteen years old. (Tr. 124). At the time of the original application for benefits in 2008, when E.B. was approximately eight years old, Dunaway reported that E.B. had no difficulty seeing or hearing and that she was not totally unable to talk. (Tr. 125-26). According to Dunaway, E.B.'s ability to communicate was limited; as examples, she noted that she was unable to deliver phone messages, repeat stories, tell jokes or riddles

accurately, or explain why she did something.  (*Id.*).  E.B. reportedly could not tell time, read simple words, sentences or stories, print some letters, write in longhand, spell most three to four letter words, add or subtract numbers over ten or make correct change when using money. (Tr. 128).  Additionally, Dunaway reported that E.B. had difficulty buttoning her clothes, washing her hair, using utensils, accepting criticism, finishing things and completing her homework.  (Tr. 131-32).  According to Dunaway, E.B. was withdrawn, had an imaginary friend, and talked to voices that she heard.  (Tr. 144)  She reportedly needed constant supervision with her activities of daily living.  (*Id.*).

> B.   **Academic Evidence (School Records and Teacher Questionnaires)**

> 1.   **First Grade (2006-2007)**

On July 24, 2007, the Committee on Special Education met to consider E.B.'s eligibility for an Individualized Education Program ("IEP") due to her speech or language impairment.  (Tr. 118-23).  According to the IEP report, E.B. demonstrated profound delays in both receptive and expressive language skills, was unable to follow multi-step directions, and had difficulty comprehending basic concepts.  (Tr. 121).  It was recommended that E.B. repeat the first grade, be classified as speech/language impaired, be provided testing accommodations, and be provided speech/language services three times a week.  (Tr. 122).

> 2.   **First Grade (2007-2008)**

E.B.'s report card for this academic year indicated that she was generally performing below or only partially meeting New York State standards for reading, mathematics, writing, science, and social studies.  (Tr. 190).  Her teacher indicated that although E.B. worked "very hard," she continued to read below grade level.  (Tr. 191).  Her progress in language and mathematics was inconsistent.  (*Id*).

On June 13, 2008, E.B.'s IEP was reviewed to assess her educational needs for the 2008-2009 school year.  (Tr. 104-09).  According to the IEP, E.B. demonstrated severe language-based delays in comprehension, memory, and higher-level concept formation, which compromised her academic performance in all areas.  (Tr. 105).  E.B. continued to demonstrate moderate to severe delays in both receptive and expressive language skills, her Developmental Reading Assessment ("DRA") level was 3, and she was unable to perform simple addition problems.  (Tr. 106).

According to the IEP, E.B.'s overall intellectual ability was in the borderline range.  (*Id.*).  The Wechsler Intelligence Scale for Children IV ("WISC-IV") was administered to her on May 25, 2007.  (*Id.*).  E.B. demonstrated verbal comprehension scores of 85, perceptual reasoning scores of 84, working memory scores of 80, processing speed scores of 80 and a full-scale score of 78.  (*Id.*).  According to the IEP, E.B.'s verbal and nonverbal reasoning abilities were in the low average range and her working memory and processing speed abilities were just within the low average range.  (*Id.*).  Her auditory processing skills were much below average and within the borderline range.  (*Id.*).

On December 15, 2006, the CELF-4 was administered to E.B.  (*Id.*).  Her core language score was 48, her receptive language score was 63, and her expressive language score was 53.  (*Id.*).  With respect to speech and language, she was assessed to need development of expressive language to communicate her ideas and answer questions in grammatically complete sentences.  (*Id.*).

The IEP indicated that E.B. benefitted from visual cues and simplified, repeated directions.  (Tr. 107).  It was recommended that she be placed in preferred seating in close proximity to the teacher and away from noise.  (*Id.*).  It was determined that E.B.'s classification

should be changed to a learning disability and that she should advance to the second grade, but

be placed in a 12:1+1 special education classroom setting and continue to receive testing

accommodations and speech/language therapy.  (Tr. 104, 107)

### 3.    <u>Second Grade (2008-2009)</u>

E.B.'s report card for this academic year indicated that she was generally

performing below or only partially meeting New York State standards for reading, mathematics,

writing, science and social studies.  (Tr. 180).  Her teacher indicated that throughout the

academic year E.B. had progressed from a reading level 3 to a reading level 10.  (Tr. 181).

On April 13, 2009, E.B.'s IEP was reviewed to assess her educational needs for

the 2009-2010 academic school year.  (Tr. 172-78).  The IEP indicated that E.B. was classified

as a student with a learning disability and that she was placed in a 12:1+1 academic setting and

was provided speech/language therapy.  (Tr. 176).

According to the IEP, E.B.'s language-based functions were severely delayed,

which compromised her academic performance in all areas.  (Tr. 174).  She demonstrated

moderate to severe delays in both receptive and expressive language skills and had a reading

level of 8, which was equivalent to a mid-first grade level.  (*Id.*).  The IEP noted that E.B. needed

to develop expressive language to communicate her ideas and answer questions in grammatically

complete sentences.  (Tr. 175).  She also needed to improve her reading comprehension and

word attack skills, and learn to recognize numbers up to fifty and to perform two digit by two

addition and subtraction problems.  (*Id.*).

According to the IEP, E.B. rarely volunteered information or raised her hand in

large group settings, but would participate in small group instructions.  (*Id.*).  She was

cooperative, had begun to take risks and lead class activities, and had made classroom friends.

(Tr. 175-76).  It was determined that E.B. should advance to the third grade and continue to be

classified as having a learning disability, continue to be placed in a 12:1+1 special education

classroom, and continue to receive speech/language therapy three times a week.  (Tr. 173, 176).

E.B. was also to receive testing accommodations, including extended time on examinations, and

having the tests read to her and administered in a separate location.  (Tr. 174).

### 4.    __Third Grade (2009-2010)__

E.B.'s report card for the first marking period for this academic year indicated

that she continued to perform below or to partially meet New York State standards in virtually all

academic subjects.  (Tr. 170).  E.B.'s IEP was reviewed on April 13, 2010 to assess her

educational needs for the 2010-2011 academic school year.  (Tr. 497-505).  The IEP indicated

that E.B. continued to display deficits in cognitive abilities and was "quite scattered in her

performance."  (Tr. 498).  According to the IEP, her visual perceptual, working memory, and

auditory processing deficits impacted her ability to learn.  (*Id.*).

E.B. continued to demonstrate moderate to severe delays in both receptive and

expressive language skills, her DRA level was 10, and she was able to write simple sentences

with adult support.  (Tr. 499).  According to the IEP, updated psychoeducational testing

demonstrated that E.B.'s cognitive abilities were unevenly developed.  (*Id.*).  The WISC-IV was

administered to her on March 23, 2010.  (*Id.*).  E.B. demonstrated verbal comprehension scores

of 81, perceptual reasoning scores of 90, working memory scores of 71, processing speed scores

of 70 and a full-scale score of 73.  (*Id.*).  According to the IEP, E.B.'s verbal comprehension was

low average, her perceptual reasoning was average, her working memory and processing speed

were in the borderline range and were an area of relative weakness.  (*Id.*).  Although her overall

cognitive ability was borderline, her thinking and reasoning abilities were more accurately

7

represented by her low average to average verbal comprehension and perceptual reasoning abilities.  (*Id.*).  E.B. continued to display deficits in visual perception, auditory processing, and both auditory and visual short-term memory.  (*Id.*).  She demonstrated poor academic fluency and weak phonetic skills.  (*Id.*).  She was assessed to be performing at mid-first to second grade academic level.  (*Id.*).

On April 1, 2010, the CELF-4 was administered to E.B.  (*Id.*).  Her core and receptive language scores were 70, and her expressive language scores were 77.  (*Id.*).  With respect to speech and language, she had a mid-second grade level vocabulary.  (*Id.*).  She continued to demonstrate difficulty with short term and working memory, as well as following two-to-four step directions involving temporal concepts, labeling categories and stating items that belonged in each category, and improving her overall vocabulary.  (*Id.*).  An evaluation completed on April 13, 2010 indicated that E.B.'s academic abilities were equivalent to late-first grade to early-second grade levels.  (Tr. 504).

The IEP indicated that E.B. required multimodal instructional methods that combined visual and auditory presentations.  (Tr. 500).  She required that instructions or directions be broken down, simplified and frequently repeated.  (*Id.*).  Additionally, she required monitoring to ensure comprehension due to her auditory processing deficits.  (*Id.*).  It was recommended that she be placed in preferred seating in close proximity to the teacher and away from noise.  (*Id.*).  It was determined that E.B. should advance to the fourth grade and continue to be placed in a 12:1+1 special education classroom setting and continue to be provided testing accommodations and speech/language therapy.  (Tr. 497-98, 501).

    5.       **Fifth Grade (2011-2012)**

        E.B.'s report card for this academic year indicated that she continued to perform below or to partially meet New York State standards in virtually all academic subjects. (Tr. 530).  Her teacher indicated that her socializing impeded her academic progress and that she continued to struggle with reading comprehension.  (Tr. 529).

        On March 30, 2012, E.B.'s IEP was reviewed to assess her educational needs for the 2012-2013 academic school year.  (Tr. 528, 531-38).  E.B.'s DRA level was 20, and she was making slow progress on her goals due to low effort and an unwillingness to complete tasks. (Tr. 531).  According to the IEP, E.B. was a multi-sensory learner who required both visual and auditory presentations.  (Tr. 534).  She also required repetition and review in instructions and needed frequent checks for understanding due to her auditory processing deficits.  (*Id.*).  She demonstrated deficits in her cognitive abilities with specific weaknesses in visual perceptual skills, working memory and auditory processing delays.  (*Id.*).  It was determined that E.B. should advance to the sixth grade, continue to be placed in a 12:1+1 special education classroom setting, and continue to be provided testing accommodations and speech/language therapy. (Tr. 528, 537).

    6.       **Teacher Questionnaires**

        E.B.'s special education teacher, Julie Brown ("Brown"), completed a teacher questionnaire in which she reported that she provided special education services to E.B. five days a week.  (Tr. 555-62).  According to Brown, although E.B. was in the sixth grade, she was reading and writing at a second grade level and performing math at a fourth or fifth grade level. (*Id.*).  In the domain of acquiring and using information, Brown found the E.B. had obvious problems comprehending oral instructions, understanding school and content vocabulary,

reading and comprehending written material, providing organized oral explanations and adequate

descriptions, expressing ideas in written form, learning new material, recalling and applying

previously-learned material, and applying problem-solving skills in class discussions.  (Tr. 556).

Additionally, Brown indicated that E.B. had slight problems comprehending and doing math

problems and understanding and participating in class discussions.  (*Id.*).  According to Brown,

E.B. needed additional support to aid comprehension, inferencing, reading, completing word

problems, and taking tests, but needed less support for math computation.  (*Id.*).

      With respect to the domain of attending and completing tasks, Brown indicated

that E.B. needed additional support with multi-step assignments and tasks.  (Tr. 557).  According

to Brown, E.B. had an obvious problem carrying out multi-step instructions and slight problems

focusing long enough to finish assigned activities or tasks, refocusing to task when necessary,

completing class/homework assignments, and working without distracting herself or others.

(*Id.*).  Brown indicated that E.B. did not have any problems paying attention when spoken to

directly, carrying out single-step instructions, waiting to take turns, changing from one activity to

another without being disruptive, organizing her own things or school materials, completing

work accurately without careless mistakes, and working at a reasonable pace or finishing on

time.  (*Id.*).

      In the domain of interacting and relating with others, Brown found that E.B. had

an obvious problem expressing her anger appropriately.  (Tr. 558).  According to Brown, E.B.

required an adult mediator if she had a conflict with a peer and also needed reminders and

prompts to stay on task and follow classroom rules and expectations.  (*Id.*).  Brown also found

the E.B. had slight problems seeking attention appropriately, asking permission appropriately,

following rules, respecting or obeying adults in authority, relating experiences and telling stories,

interpreting the meaning of facial expression, body language, hints and sarcasm, and using
adequate vocabulary and grammar to express thoughts or ideas in general, everyday
conversation.  (*Id.*).  According to Brown, E.B. had no problems playing cooperatively with
other children, making and keeping friends, using language appropriate to the situation and the
listener, introducing and maintaining relevant and appropriate topics of conversation, or taking
turns in conversation.  (*Id.*).  Brown opined that E.B's speech was almost always intelligible
irrespective of whether the topic of conversation was known or unknown.  (*Id.*).

      In the domain of caring for herself, Brown reported that E.B. needed added
support when she becomes frustrated with school work.  (Tr. 560).  According to Brown, at times
E.B. "will shut down" instead of asking for help.  (*Id.*).  Brown identified that E.B. had obvious
problems handling frustration appropriately, identifying and appropriately asserting emotional
needs, and using appropriate coping skills to meet daily demands.  (*Id.*).  She also identified
slight problems being patient when necessary and knowing when to ask for help.  (*Id.*).
According to Brown, E.B. did not have any problems taking care of her personal hygiene, caring
for her physical needs, or using good judgment regarding personal safety and dangerous
circumstances.  (*Id.*).  Brown indicated that E.B. did not have problems in the domain of moving
about and manipulating objects.  (Tr. 559).

      E.B.'s speech and language therapist, Bethany Kryger ("Kryger"), MS,
CCC-SLP, indicated that, in the domain of acquiring and using information, E.B. struggled with
her short and long term memory and her ability to retrieve information.  (Tr. 547).  According to
Kryger, these difficulties affected E.B's decoding and reading skills, comprehension of spoken
and written language, and ability to demonstrate or express what she knows or has learned.  (*Id.*).
Kryger indicated that E.B. had very serious problems in her ability to read and comprehend

written material, express ideas in written form, and recall and apply previously-learned material. (*Id.*).  Additionally, Kryger reported that E.B. had serious problems comprehending oral instructions, providing organized oral explanations and adequate descriptions, and learning new material.  (*Id.*).  Kryger also assessed that E.B. demonstrated obvious problems understanding school and content vocabulary and understanding and participating in class discussions.  (*Id.*).

In the domain of attending and completing tasks, Kryger reported that E.B. required additional time to process information that she heard or read and that information had to be repeated to E.B. multiple times.  (Tr. 548).  On listening tasks, E.B. tended to need increased redirection because she struggled to remember and make sense of what she heard.  (*Id.*).  Kryger indicated that E.B. demonstrated no problems in the domains of moving about and manipulating objects and caring for herself.  (Tr. 550-51).  Kryger indicated that she was unable to assess E.B.'s abilities in the domain of interacting and relating with others.  (Tr. 549).

## III.   **Relevant Medical Evidence**[2]

### A.      **School Evaluations**

On March 11, 2008, while E.B. was repeating the first grade, Patricia Wissman ("Wissman"), MA, CCC-A, a state-licensed audiologist, conducted an audiological evaluation of E.B.  (Tr. 216-19).  According to Wissman, E.B. was referred due to poor phonemic awareness, slow response to verbal stimuli, and severe delays in receptive and expressive language.  (*Id.*).  Wissman assessed that E.B. had a normal hearing sensitivity in both ears and was able to hear clearly without visual cues at average conversation speech levels and opined that the testing results did not indicate a need for educational amplification.  (*Id.*).  Given E.B.'s history of difficulty attending to and processing verbal messages, Wissman opined that E.B. would not be

_____

[2]  Only those portions of the treatment records that are relevant to this decision are summarized herein.

able to tolerate personal amplification and recommended that E.B. be given a medical evaluation to assess her difficulties in maintaining attention.  (*Id.*).  Wissman recommended that E.B. be provided preferred seating in close proximity to teachers with a clear view of manual communication and visual cues.  (*Id.*).  Wissman also recommended that E.B. be seated away from noise sources and that background noise be minimized during instruction.  (*Id.*).

On April 21, 2008, Loretta Armstrong ("Armstrong"), a certified school psychologist, conducted a psychological evaluation of E.B.  (Tr. 210-15).  During the evaluation, Armstrong reviewed the results of the Wechsler Individual Achievement Test – Second Edition (WIAT-II) and the WISC-IV that had been administered to E.B. in May 2007.  (*Id.*).  She also administered the WIAT-II and the Test of Auditory Processing Skills-Third Edition (TAPS-3) during the evaluation.  (*Id.*).  She found E.B. to be cooperative and polite throughout the evaluation and generally able to concentrate on the variety of tasks that were presented to her. (*Id.*).

Armstrong opined that E.B.'s overall intellectual functioning was in the borderline range, while her verbal comprehension, perceptual reasoning abilities, working memory, and processing speed were in the low average range.  (*Id.*).  E.B.'s reading composite and mathematics composite scores were in the borderline range, and her written language composite score was in the extremely low range.  (*Id.*).  According to Armstrong, E.B. had not made significant progress since her previous evaluation.  (*Id.*).

Armstrong found E.B.'s auditory processing skills to be in the borderline range across the board with weak auditory short-term memory skills.  (*Id.*).  Armstrong opined that E.B. may have difficulty completing tasks within a certain time and recalling rules given orally by the teacher, particularly for multi-step tasks requiring E.B. to recall instructions for how to

integrate pieces of information.  (*Id.*).  Armstrong further opined that E.B. would benefit from individualized instruction, repetition of information, and having information broken down into steps.  (*Id.*).

On May 1, 2008, Theresa C. Manscuk ("Manscuk"), a speech pathologist, evaluated E.B.'s speech and language.  (Tr. 204-09).  Manscuk reported that E.B. had originally been referred for evaluation in December 2006, at which time she was assessed to have severe-profound delays in both receptive and expressive language.  (*Id.*).  Manscuk found that E.B. demonstrated intelligible speech with normal pitch, quality, loudness, rate, rhythm, and prosody.  (*Id.*).

Manscuk administered the Comprehensive Assessment of Language Fundamentals ("CASL") test to E.B., which yielded a core composite standard score of 74, indicating an overall severe delay in language skills.  (*Id.*).  According to Manscuk, E.B.'s scores indicated that she had a foundation in determining the correct syntactic and grammatical use and was able to complete sentences with appropriate structures.  (*Id.*).  E.B. also demonstrated the ability to understand and answer questions about paragraphs read orally, but had difficulty appropriately responding in a given social interchange, constructing grammatically complete sentences spontaneously, and interpreting phrases that involved figurative language, sarcasm, and indirect requests.  (*Id.*).

According to Manscuk, E.B. had demonstrated gains in comprehension of basic concepts and in her use of more complex language structure.  (*Id.*).  She continued to require both incremental presentations to avoid frustration and multi-contextual presentations in order to retain new concepts and vocabulary.  (*Id.*).  Manscuk recommended that E.B. be provided

frequent repetition of directions and hands-on, multi-sensory activities for maximum learning.

(*Id.*).  Manscuk described E.B. as a delightful, cooperative, and hard-working child.  (*Id.*).

### B.      Strong Pediatrics Medical Records

Medical records from Strong Memorial Hospital ("Strong") demonstrate that E.B.

received medical treatment at Strong between 2007 and 2012.  (Tr. 247-96, 568-78, 590-619).

Well-child visits in 2007, 2008 and 2010 generally indicated that E.B. was physically healthy,

but had demonstrated learning delays in school.  (Tr. 247-49, 250-52, 570-78, 593-96).  E.B.

reportedly demonstrated appropriate behavior at home and school and when playing with friends.

(*Id.*).  Although E.B. was unable to read or perform math at grade level, she demonstrated pride

in her achievements, was able to talk about what occurred during school, and completed her

school work.  (*Id.*).

In August 2012, E.B. was evaluated for syncope after a series of three fainting

spells that had occurred during the previous year.  (Tr. 610).  According to her medical records,

E.B.'s cardiac auscultatory exam and electrocardiogram were normal, and she was diagnosed

with vasovagal syncope and advised to return for further evaluation if her episodes increased in

frequency, particularly if associated with activity.  (Tr. 613-14).

### C.      Christin Windheim, MS, CCC-SLP

On August 12, 2008, state examiner Christine Windheim ("Windheim"), MS,

CCC-SLP, a speech-language pathologist, conducted a speech and language evaluation of E.B.

(Tr. 230-33).  E.B. was accompanied by her mother and sister.  (*Id.*).  Dunaway reported that

E.B.'s delivery was unremarkable and that E.B. had a learning disability and speech and

language delays.  (*Id.*).  E.B. willingly accompanied the examiner to the exam room and was

cooperative during the evaluation.  (*Id.*).  Windheim opined that the results of the evaluation were a valid and reasonable estimate of E.B.'s current functioning.  (*Id.*).

Upon examination, Windheim found E.B.'s oral structures, voice, fluency, and hearing to be normal.  (*Id.*).  She assessed a delay in E.B's pragmatic skills, demonstrated by impulsivity and a fidgety nature.  (*Id.*).  Windheim administered the CELF-4 to E.B.  (*Id.*).  E.B.'s receptive language score was 59, her expressive language score was 51, and her core language score was 46.  (*Id.*).  According to Windheim, E.B. demonstrated a severe delay in the areas of receptive and expressive language as evidenced by scores that were two standard deviations below the mean.  (*Id.*).

Windheim also administered the Sounds-in-Words Subtest of the Goldman Fristoe Test 2 of Articulation.  (*Id.*).  E.B. produced zero errors out of a possible seventy-seven sounds, placing her above the 40th percentile for females of her age.  (*Id.*).  Windheim also informally assessed E.B.'s intelligibility and opined that she was fully intelligible for both known and unknown listeners.  (*Id.*).

Windheim opined that E.B. was able to produce sounds in words at an age appropriate level and that her vocal quality and fluency skills were within normal limits.  (*Id.*).  According to Windheim, E.B. suffered from severe expressive and receptive language delays that would affect her educational performance and general communication skills.  (*Id.*).  Windheim opined that E.B. demonstrated a significant impairment in her speech and language skills, but opined that her prognosis was good with continued intervention.  (*Id.*).

###    D.    J.M. Weir, SLP

On August 19, 2008, J.M. Weir ("Weir"), a speech-language pathologist, reviewed E.B.'s school records, including her 2006 CELF-4 scores, and Windheim's report,

including the CELF-4 scores reported by Windheim, and opined that E.B.'s communication

difficulties resulted in a marked limitation in the domain of acquiring and using information and

a less than marked limitation in the domain of interacting and relating with others.  (Tr. 234).

According to Weir, E.B.'s CELF-4 scores were lower than those obtained on other language

tests.  (*Id.*).

On December 14, 2010, Weir re-evaluated E.B.'s speech and language

impairments after reviewing updated records, including the results of a CELF-4 test administered

in April 2010.  (Tr. 579-80).  Again, Weir opined that E.B. had no more than a marked limitation

in the domain of acquiring and using information due to her communication limitations.  (*Id.*).

According to Weir, E.B. suffered from a less than marked limitation in the domain of interacting

and relating with others.  (*Id.*).

E.      **K. Prowda, Psychiatry**

On August 20, 2008, agency medical consultant Dr. K. Prowda ("Prowda")

completed a Childhood Disability Evaluation.  (Tr. 236-41).  Prowda concluded that E.B.

suffered from a severe impairment or combination of impairments, but opined that her

impairments did not meet or equal a listed impairment.  (*Id.*).  Prowda opined that E.B. suffered

from a marked limitation in her ability to acquire and use information.  (*Id.*).  In addition,

Prowda opined that E.B. suffered from a less than marked limitation in her ability to attend and

complete tasks.  (*Id.*).  Prowda assessed that E.B. did not suffer from any limitations in her health

and physical well-being and in her ability to interact and relate to others, move about and

manipulate objects, and care for herself.  (*Id.*).  In making this assessment, Prowda reviewed

Weir's and Windheim's opinions.  (*Id.*).  She also reviewed E.B.'s school records, including the

results of various tests that had been administered to E.B.  (*Id.*).  Prowda opined that although

E.B. suffered from a learning disability and speech-language difficulties, the records did not support a marked limitation finding for any of the domains other than the domain of acquiring and using information. (*Id.*).

On December 20, 2010, Prowda completed an additional Childhood Disability Evaluation.[3]  (Tr. 581-86).  Again, Prowda concluded that E.B. suffered from a severe impairment or combination of impairments, but opined that her impairments did not meet or equal a listed impairment.  (*Id.*).  Prowda opined that E.B. suffered from a marked limitation in her ability to acquire and use information.  (*Id.*).  According to Prowda, although E.B.'s test scores indicated a less than marked limitation stemming from her cognitive skills, her communication deficits warranted a marked finding in this domain.  (*Id.*).  In addition, Prowda opined that E.B. suffered from less than marked limitations in her ability to attend and complete tasks, and interact and relate with others.  (*Id.*).  According to Prowda, E.B.'s school records demonstrated that she was social and cooperative and had friends.  (*Id.*).  Additionally, she had no reported speech difficulties or intelligibility deficits.  (*Id.*).  Thus, Prowda opined that her ability to interact and relate with others was less than marked.  (*Id.*).  Prowda assessed that E.B. did not suffer from any limitation in her health and physical well-being and in her abilities to move about and manipulate objects and care for herself.  (*Id.*).

## IV.    Proceedings before the ALJ

At the administrative hearing, Dunaway testified that E.B. was twelve years old and lived with Dunaway and Dunaway's three other children.  (Tr. 345).  According to Dunaway, E.B. was enrolled in the sixth grade in a special education classroom with a total of

---

[3]  Prowda was the agency consultant with the overall responsibility for the assessment, although Weir was also consulted in formulating the assessment.  (Tr. 582).

twelve students.  (Tr. 346).  E.B. had repeated the first grade.  (*Id.*).  At school, E.B. was

provided speech therapy and testing accommodations.  (Tr. 347, 357).  According to Dunaway,

despite these interventions, E.B. was performing at a second grade level in reading, writing, and

some mathematics, and her grades were below New York State standards.  (Tr. 347, 349-50).

Despite her lack of academic progress, Dunaway testified, the school continued to advance her to

higher grade levels.  (Tr. 357).  Dunaway helps E.B. with her homework every night for

approximately one-and-a-half hours.  (Tr. 349).

Dunaway testified that E.B. likes to read, but does not comprehend stories unless

they are read to her multiple times.  (Tr. 350-51).  Additionally, Dunaway testified that E.B.'s

writing is below average due to her difficulties with spelling and reading.  (Tr. 351).

According to Dunaway, E.B. has friends at school and does not have any

problems interacting with her friends.  (Tr. 351-52).  E.B.'s friends and siblings are able to

understand her speech.  (Tr. 361-62).  Dunaway testified that E.B. does have some difficulty

interacting with teachers, particularly new teachers, when she does not understand the lesson.

(Tr. 352).  According to Dunaway, E.B. will "shut down" when she is not able to comprehend

lessons at school.  (Tr. 352, 358).  Dunaway testified that E.B. received special transportation to

school due to her inability to follow safety procedures and instructions when crossing the street.

(Tr. 352-54).

E.B. testified that she was in the sixth grade and "love[d]" school, particularly

gym and math class.  (Tr. 369-70).  According to E.B., she was doing well in school and did not

find it difficult.  (Tr. 370-71).  She testified that she completed her homework with some

assistance from her mother.  (Tr. 371).  She had participated in a weekend dance class during the

previous two years, but had recently stopped attending.  (Tr. 366-69).

E.B. testified that she has several friends at school and had invited one friend to

her house and had been invited to that friend's house.  (Tr. 368).  E.B. spends her free time

watching television and reading in her room.  (Tr. 369).  She does not use computers or cell

phones.  (*Id.*).


## DISCUSSION

I.   **Standard of Review**

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether E.B. is disabled[;] . . . [r]ather, we must determine whether the Commissioner's

conclusions are supported by substantial evidence in the record as a whole or are based on an

erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C.

§ 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by

"substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to

any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is

defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A child is disabled for the purposes of SSI if they have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).  When assessing whether a claimant is disabled, the ALJ must employ a three-step sequential analysis.  *See Miller v. Comm'r of Soc. Sec.*, 409 F. App'x 384, 386 (2d Cir. 2010).  The three steps are:

(1)   whether the child is engaged in substantial gainful activity;

(2)   whether the child has a medically determinable impairment that is severe such that it causes more than minimal functional limitations; and

(3)   whether the child's impairments medically equal or functionally equal a presumptively disabling condition listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations.

*See id.* (citing 20 C.F.R. § 416.924(b)-(d)).

In determining whether a child's impairment functionally equals a listed impairment, the ALJ must evaluate the child's functioning across the following six domains of functioning:

(1)   acquiring and using information;

(2)   attending and completing tasks;

(3)   interacting and relating with others;

(4)   moving about and manipulating objects;

(5)   caring for oneself; and

(6)   health and physical well-being.

*See id.* (citing 20 C.F.R. § 416.926a(a)).  To be functionally equivalent, the impairment must result in a finding of "extreme" functional limitations in at least one domain or a finding of "marked" functional limitations in at least two domains.  *See id.*

A "marked" limitation is one that is "more than moderate but less than extreme" and that "interferes seriously with [a child's] ability to independently initiate, sustain or complete activities."  20 C.F.R. § 416.926a(e)(2)(i); *see also Spruill ex rel. J.T. v. Astrue*, 2013 WL 885739, *5 (W.D.N.Y. 2013) ("[a] marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the child's] ability to function independently, appropriately, effectively, and on a sustained basis") (quoting 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)). Generally, a "marked" limitation is the equivalent of functioning resulting in scores on standardized tests that are "at least two, but less than three, standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation is one which "interferes very seriously

with [a child's] ability to independently initiate, sustain or complete activities."  20 C.F.R.

§ 416.926a(e)(3)(i).

       In his decision, the ALJ followed the required three-step analysis for evaluating

childhood disability claims.  (Tr. 317-31).  Under step one of the process, the ALJ found that

E.B. had not engaged in substantial gainful activity since June 19, 2008, the application date.

(Tr. 320).  At step two, the ALJ concluded that E.B. has the severe impairments of learning

disability and speech/language delays.  (*Id.*).  At step three, the ALJ determined that E.B. does

not have an impairment (or combination of impairments) that meets or medically equals one of

the listed impairments.  (*Id.*).  In addition, the ALJ concluded that E.B. did not have an

impairment (or combination of impairments) that functionally equaled one of the listed

impairments.  (Tr. 320-31).  In reaching this conclusion, the ALJ evaluated E.B.'s impairments

across the six domains of functioning, noting that he had been directed to pay "special attention"

to the domains of acquiring and using information and interacting and relating to others because

Judge Larimer had "not f[ound] a lack of support for the findings in the other four domains of

functioning."  (Tr. 317).  Specifically, the ALJ concluded that E.B. suffered from marked

limitations in the domain of acquiring and using information and less than marked limitations in

the domains of attending and completing tasks and interacting and relating with others.

(Tr. 324-27).  In addition, the ALJ concluded that E.B. had no limitations in the domains of

moving about and manipulating objects, caring for herself, and health and physical well-being.

(Tr. 326, 328-30).  Accordingly, the ALJ found that E.B. is not disabled.  (*Id.*).

II.    <u>Analysis</u>

   In her motion, Dunaway contends that the ALJ erred when he determined that

E.B. does not suffer from an impairment or combination of impairments that functionally equals

a listed impairment.  (Docket # 8).  Specifically, Dunaway contends that the ALJ erred when he

found that E.B. has "less than marked" limitations in the domain of interacting and relating with

others.  (*Id.* at 13-17).  Because Dunaway challenges only the ALJ's findings as to interacting

and relating with others, the Court's analysis addresses this domain of functioning.

   In evaluating the level of impairment in the domain of interacting and relating

with others, consideration must be given to "how well the child initiates and sustains emotional

connections with others, develops and uses the language of her community, cooperates with

others, complies with rules, responds to criticism, and respects and takes care of the possessions

of others."  *Dayton v. Astrue*, 2012 WL 4711988, *5 (N.D.N.Y. 2012) (citing 20 C.F.R.

§ 416.926a(i)).  The regulations provide that children should be able to "respond appropriately to

a variety of emotional and behavioral cues[;] . . . speak intelligibly and fluently so that others can

understand; . . . participate in verbal turntaking and nonverbal exchanges; consider others'

feelings and points of view; follow social rules for interaction and conversation; and respond to

others appropriately and meaningfully."  20 C.F.R. § 416.926a(i)(1)(iii).  The regulations further

provide that school-age children should be able to develop more lasting friendships with children

of their own age.  20 C.F.R. § 416.926a(i)(2)(iv).  They should also be able to begin to

understand how to work in groups and have an increasing ability to understand another's point of

view and to tolerate differences.  *Id.*  Additionally, they should be "well able to talk to people of

all ages, to share ideas, tell stories and to speak in a manner that both familiar and unfamiliar

listeners readily understand."  *Id.*

Children with limited functioning in this domain include children who do not reach out to be picked up and held by caregivers; have no close friends within their age group; avoid or withdraw from known people or are overly anxious or fearful of meeting new people or trying new experiences; have difficulty playing games or sports; have difficulty communicating with others using verbal and nonverbal skills to express themselves; have difficulty speaking intelligibly or with adequate fluency.  20 C.F.R. § 416.926a(i)(3).

In promulgating the relevant regulations, the Social Security Administration specifically recognized that "'communication' comprises speech and language, and that language is used both for learning and for interacting and relating.'"  *See Kittles ex rel. F.L. v. Barnhart*, 245 F. Supp. 2d 479, 489 (E.D.N.Y. 2003) (quoting Supplemental Security Income; Determining Disability for a Child Under Age 18, 65 Fed. Reg. 54746-01, 54759 (September 11, 2000) (to be codified at 20 C.F.R. §§ 404, 416)).  As the Social Security Administration has acknowledged, "[a] child's language abilities are equally important in the domain of interacting and relating with others."  *Miles ex rel. J.M. v. Astrue*, 775 F. Supp. 2d 715, 727 (S.D.N.Y. 2011) (citing S.S.R. 09-5p, 2009 WL 396026, *5 (2011)).  Accordingly, "a child's problems with speech and language now need to be assessed in both the 'acquiring and using information' domain as well as the 'interacting and relating with others' domain."  *Kittles ex rel. F.L. v. Barnhart*, 245 F. Supp. 2d at 489.

When evaluating a child's level of impairment, the ALJ should "consider all relevant evidence in determining a child's functioning," including information from the child's teachers or from therapists.  *Swan v. Astrue*, 2010 WL 3211049, *6 (W.D.N.Y. 2010); *Yensick v. Barnhart*, 245 F. App'x 176, 181 (3d Cir. 2007) ("[t]he ALJ may also consider other opinions about a claimant's disability from persons who are not deemed 'acceptable medical sources,'

such as a therapist who is not a licensed or certified psychologist"). Evidence from teachers or therapists "cannot establish the existence of a medically determinable impairment," but their opinions may be used "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." *See* Social Security Ruling 06-03P, 2006 WL 2329939, *2 (2006).

Social Security Ruling 06-03P recognizes that "[n]on-medical sources who have had contact with the individual in their professional capacity, such as teachers . . . who are not health care providers, are also valuable sources of evidence for assessing impairment severity and functioning[;] [o]ften, these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time." *Id*. In evaluating evidence supplied by sources such as teachers or therapists, the ALJ should consider:

(1)   how long the source has known and how frequently the source has seen the individual;

(2)   how consistent the opinion is with other evidence;

(3)   the degree to which the source presents relevant evidence to support an opinion;

(4)   how well the source explains the opinion;

(5)   whether the source has a specialty or area of expertise related to the individual's impairment(s); and

(6)   any other factors that tend to support or refute the opinion.

*Id.* at *4-5.

According to Dunaway, the ALJ failed to comply with Judge Larimer's Decision and Order by failing to consider the results of the CELF-4 test in evaluating whether E.B. had a limitation in this domain. (Docket # 8 at 13-15). Further, Dunaway contends that the ALJ did

not properly acknowledge other information contained in the record, including school records and testimony, both of which suggested that E.B. had limitations in this domain.  (*Id.* at 15-17).

On review, I conclude the ALJ's decision does not demonstrate that he fully and adequately considered the affect of E.B.'s demonstrated severe speech and language delays in assessing her limitations in the domain of interacting and relating with others.  Judge Larimer's previous decision remanding the matter explicitly noted that the ALJ apparently had not "considered the impact of [E.B.'s] severe delays in receptive and expressive language on her ability to engage in human interaction" or "properly appl[ied]" her CELF-4 scores in concluding that E.B.'s communication deficits did not produce a marked limitation in her ability to communicate with her peers, family and others.  (Tr. 406-07).  Judge Larimer reasoned that CELF-4 scores are relevant in evaluating potential limitations in this domain and that "regardless of her good social skills and classroom demeanor," CELF-4 scores that are two standard deviations below the mean may warrant a finding of a marked limitation.  (*Id.*).  Given his concern that the ALJ focused on E.B.'s social skills without considering whether her speech and language deficiencies limited or affected her abilities in this domain, Judge Larimer remanded for further consideration of the domain.  (*Id.*).

Despite Judge Larimer's expressed concern, and his explicit direction that those scores be considered on remand, the ALJ did not explicitly discuss the CELF-4 scores in evaluating this domain.  Although the ALJ mentioned Windheim's report, which contained results of the 2008 CELF-4 testing,[4] in one sentence in his decision, he failed to acknowledge the scores or to reconcile Windheim's conclusion that E.B.'s scores were two standard deviations below the mean with his conclusion that E.B. did not suffer from marked limitations in this

---

[4]  The record contains three sets of CELF-4 testing results, including results for tests administered in 2006, 2008 and 2010.  (Tr. 106, 231, 499).

domain.  Although a CELF-4 score of two standard deviations or more below the mean does not

necessarily warrant a finding of marked limitations in the domain of interacting and relating with

others unless the evidence also demonstrates that a claimant's "day-to-day functioning in

domain-related activities is consistent with that score," *Miles ex rel. J.M. v. Astrue*, 502 F. App'x

59, 61 (2d Cir. 2012) (quoting 20 C.F.R. § 416.926a(2)(iii)), the ALJ's failure to discuss the

scores at all raises doubts as to whether the ALJ gave proper consideration to E.B.'s speech and

language deficits in analyzing her limitations in this domain.  *See Martinez v. Astrue*, 2008 WL

4178155, *8 (S.D.N.Y. 2008) ("[g]iven the obvious potential relevance of the results of the

[CELF] test to an evaluation of the domain area[] of . . . 'interacting and relating with others,'

this test should have been addressed further . . . in the ALJ's decision[;] [i]n other words, an

understanding of the relevance of this test appears to be 'crucial' to the evaluation of [claimant's]

abilities[,] . . . [and] without an explanation from the ALJ as to how he took [speech-language

pathologist's CELF-4] report into account, this [c]ourt cannot determine whether the ALJ's

decision was supported by substantial evidence").

Indeed, the ALJ's discussion of this domain, although expanded from his prior

decision, remains focused on E.B.'s ability to make friends and her generally compliant and

respectful behavior.  (Tr. 327).  Of course, "nice kids can be disabled, too," *Heath ex rel. D.H. v.*

*Astrue*, 2009 WL 3488089, *11 (E.D. Wis. 2009), and the "domain of interacting and relating

with others concerns more than fights and disruptive behavior," *McClain v. Barnhart*, 299

F. Supp. 2d 309, 326 (S.D.N.Y. 2004).  Although he acknowledged that communication is

"essential" to this domain, the ALJ's analysis of this domain primarily concerned E.B.'s social

development as reflected in school records, without directly addressing whether and to what

extent her language and speech delay affects her ability to function in this domain.  (Tr. 326-27).

The only record evidence cited by the ALJ in his analysis of this domain was his own observations that E.B. was intelligible and notations in her school records demonstrating her ability to socialize with her peers.  (*Id.*).

The ALJ failed to discuss in his analysis record evidence suggesting that E.B. has limitations communicating effectively, even in her highly structured classroom setting.  For instance, E.B.'s mother and her teacher each expressed concerns that E.B.'s ability to communicate is hindered when she becomes frustrated.  (Tr. 352, 560).  Dunaway testified that E.B. "shuts down" when she becomes overwhelmed in the classroom, preventing effective communication with her teacher.  (Tr. 352).  Dunaway's testimony was corroborated by Brown, who indicated that E.B. "will shut down instead of asking for help" when she encounters difficulty understanding school work.  (Tr. 560).  Brown also indicated that E.B. requires adult intervention to mediate disputes with classmates.  (Tr. 558).  The ALJ noted Brown's observations when reciting the evidence of record, but failed to reconcile this evidence in concluding that E.B.'s limitations in the domain of interacting and relating were less than marked.  "While the ALJ is not required to reconcile every shred of evidence, the ALJ must acknowledge relevant evidence and explain his rejection of such evidence."  *Rossi v. Comm'r of Soc. Sec.*, 2010 WL 5313771, *14 (N.D.N.Y.) (quoting *Walker ex rel. J.B. v. Astrue*, 2010 WL 2287566, *15 (N.D.N.Y. 2010)), *report and recommendation adopted*, 2010 WL 5325633 (N.D.N.Y. 2010).  This shortcoming is particularly pronounced where, as here, the case was previously remanded with directions to consider whether E.B.'s communication deficits affect her abilities in this domain.  At the very least, the ALJ should have re-contacted Brown to explore the frequency and duration of E.B.'s tendency to "shut down," the effect of those

episodes on E.B.'s ability to interact and relate to others, and whether the episodes appear to be triggered by or related to her speech and language deficits.

Although E.B.'s teacher found no "serious" or "very serious" problems in this domain, "the list sub-criteria [in the form completed by Brown] do not focus on the intelligibility or fluency of the child's speech." *Id.* at *13. Further, the ALJ's analysis, which relies heavily upon E.B.'s school records, does not meaningfully evaluate whether E.B.'s ability to socialize and make friends owes in part to the highly structured nature of E.B.'s classroom setting. *Id.*; *see Marizan ex rel. A.O. v. Colvin*, 2014 WL 3905911, *13 (S.D.N.Y. 2014) ("[t]he ALJ also failed to consider how [claimant] might function outside of the highly structured special education program in which most of his social interactions took place").

Although the ALJ did acknowledge that E.B. suffered from a severe speech and language delay, he concluded that such delay did not "prevent her from interacting with others." (Tr. 327). The relevant analysis, however, "should consider not only what the child 'cannot do' but also what a child '[has] difficulty doing, need[s] help doing, or [is] restricted from doing' because of her impairment." *Kittles ex rel. L.F.*, 245 F. Supp. 2d at 489 (quoting 65 Fed. Reg. at 54755-58). In sum, I find – as Judge Larimer did previously – that the ALJ's discussion of this domain is too cursory to permit this Court to determine whether the ALJ properly considered E.B.'s speech and language deficits, not just in connection with her ability to form social relationships, but also in connection with her ability to effectively communicate inside and outside the classroom. *See Marizan ex rel. A.O. v. Colvin*, 2014 WL 3905911 at *13 ("[i]n concluding that [claimant's] limitations in interacting and relating with others were 'less than marked,' the ALJ relied heavily on . . . observations that [claimant] was 'friendly' and 'cooperative'[;] [h]e neglected, however, to consider the effects that [claimant's] receptive and

expressive language delays may have had on his ability to interact with those around him[;] . . . [h]is failure to do so amounts to error"); *Heath ex rel. D.H. v. Astrue*, 2009 WL 3488089 at *11-12 (remanding where ALJ's decision focused on claimant's ability to socialize with peers, but did not discuss record evidence demonstrating significant communication difficulties); *Perez v. Astrue*, 2009 WL 3076259, *7 (D. Colo. 2009) ("[b]ecause of the importance of speech to the domain of interacting and relating with others, as demonstrated by the Commissioner's regulations and policy interpretations, the ALJ's apparent failure to consider [claimant's] language impairment in this context was error"); *Thompson v. Barnhart*, 2004 WL 896663, *7 (E.D.N.Y. 2004) ("the ALJ fails to adhere to the SSA regulations by not considering the impact of [claimant's] language delays on his socialization skills").

      Although the record contains significant evidence demonstrating that E.B. suffers from a severe language and speech delay and that her delay causes her to suffer limitations in the domain of interacting and relating with others, there is conflicting evidence in the record regarding the extent and degree of E.B.'s limitations in this domain, including Prowda's and Weir's opinions that E.B. did not suffer from marked limitations in this domain.  The ALJ's decision does not establish that such conflicts have been appropriately considered or analyzed, thus requiring remand.

      I also reluctantly conclude that the current record does not contain "persuasive proof of disability," such that a remand for further evidentiary proceedings would be unnecessary.  *See Martinez v. Barnhart*, 262 F. Supp. 2d 40, 49 (W.D.N.Y. 2003).  As courts have repeatedly acknowledged, "[d]elay 'is harmful for any litigant, but particularly in connection with benefits for children, which are not to replace lost income, but to enable low-income families to afford special education, medical treatment, physical rehabilitation, early

intervention services, and personal needs assistance for the child.'" *Lavalley ex rel. A.W. v. Colvin*, 2013 WL 2444203, *15 (N.D.N.Y. 2013) (quoting *Nieves ex rel. Nieves v. Barnhart*, 2004 WL 2569488, *10 (S.D.N.Y. 2004)).  Nonetheless, "absent a finding that the claimant was actually disabled, delay alone is an insufficient basis on which to remand for benefits." *Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996).  Considering the substantial delay in rendering a determination on Dunaway's claim for benefits for E.B., however, I "urge the Commissioner to expedite the proceedings on remand." *Tejada v. Apfel*, 167 F.3d 770, 776 (2d Cir. 1999).


## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 10)** is **DENIED**, and Dunaway's motion for judgment on the pleadings **(Docket # 8)** is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.  On remand, the ALJ must evaluate E.B.'s limitations in the domain of interacting and relating with others.  In doing so, the ALJ should explicitly consider E.B.'s CELF-4 scores and discuss whether, and to what extent, her severe speech and language delays affect her abilities in this domain.  The ALJ should also contact E.B.'s teachers to explore her reported tendency to "shut down," including the frequency

and duration of such episodes, the effect of such episodes on her ability to interact and relate to

others, and whether the episodes appear triggered by or related to E.B.'s speech and language

deficits.  The Commissioner is urged to expedite the proceedings on remand.

**IT IS SO ORDERED.**


_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
September 29, 2015